44 P.3d 506 (2002)
Cisilie A. VAILE, Petitioner,
v.
The EIGHTH JUDICIAL DISTRICT COURT of the State of Nevada, In and For the COUNTY OF CLARK, and the Honorable Cynthia Dianne Steel, District Judge, Family Court Division, Respondents, and
R. Scotlund Vaile, Real Party in Interest.
No. 36969.
Supreme Court of Nevada.
April 11, 2002.
*509 Marshal S. Willick, Las Vegas, for Petitioner.
Rawlings, Olson, Cannon, Gormley & Desruisseaux and Peter M. Angulo, Las Vegas, for Real Party in Interest.
BEFORE THE COURT EN BANC.

OPINION
AGOSTI, J.
In this original petition for extraordinary relief we are asked to decide two questions: (1) whether the district court had jurisdiction over one of the parties and over the subject matter when it entered a decree of divorce; and (2) whether the district court correctly concluded that it need not make determinations pursuant to the Hague Convention on the Civil Aspects of International Child Abduction[1] regarding the children's habitual residence and whether the children were wrongfully removed from their habitual residence.

I.
In 1989, Petitioner, Cisilie Vaile, a citizen of Norway, met the Real Party in Interest, Scotlund Vaile, a United States citizen, in Norway. Both were twenty years old. The couple became engaged in early 1990, two weeks after Scotlund, who is fluent in the Norwegian language, had completed his duties as a missionary in Norway. Shortly after becoming engaged, Scotlund returned to live with his father and stepmother in the state of Ohio where he had earlier lived before his assignment to Norway. Cisilie followed within a short period of time. The couple married in Utah in 1990 and then returned to Ohio while Scotlund attended Ohio State University. Scotlund completed his graduate program in 1996; the family then moved to Virginia for Scotlund's employment as an engineer. The couple's children, Kaia and Kamilla, were born in the United States in 1991 and 1995, respectively. Because of their parents' nationalities, the children enjoy dual Norwegian and United States citizenship. In August 1997, the family relocated to London, England, where Scotlund's engineering firm had transferred him.
By the autumn of 1997, Scotlund and Cisilie were experiencing grave difficulties in their marriage. In the spring of 1998, the couple agreed to divorce. Fearing Scotlund would take the children to the United States, Cisilie turned to the British courts. She ultimately obtained an agreement from Scotlund upon which the British court based an order dated June 8, 1998. The order prohibited Scotlund from removing the children from the United Kingdom and also prohibited him from removing the children from Cisilie's care until July 8, 1998, when the matter could be heard. On July 7, 1998, Scotlund presented Cisilie with a twenty-three-page written agreement. Cisilie signed the agreement, which purported to settle the couple's property and financial affairs, and which also purported to settle matters of child custody, support and visitation. The agreement contained a provision that the parties would obtain a divorce in Nevada, where Scotlund's mother and stepfather had relocated from Maine in the spring of 1998.
After a hearing in the British court on July 8, 1998, at which both Scotlund and Cisilie appeared, the court entered a written order on July 9 in which Cisilie was granted physical custody of both children and received permission to remove the children permanently from Britain. Scotlund was permitted to have his passport returned to him. The order noted that Scotlund had departed the *510 United Kingdom to go the United States on the morning of July 9, 1998. Cisilie and the children traveled to Norway on July 13, 1998, and remained there for nearly two years, until May 2000. On July 14, 1998, Scotlund signed a verified complaint for divorce, which was filed in the Eighth Judicial District Court in Clark County, Nevada, on August 7, 1998. Cisilie's answer, in proper person, was filed the same day. Scotlund departed Las Vegas on July 22, 1998, and after vacationing briefly in California, returned during the first week of August 1998 to his work in London.
Scotlund's complaint alleged that he, the plaintiff, was a resident of Nevada and that he had been physically present in Nevada for more than six weeks prior to the filing of the complaint and that he had the intention of making Nevada his home for an indefinite period of time. Of course, this was not true.
The district court in Clark County, without a hearing, entered a decree of divorce on August 10, 1998. The decree incorporated the terms of the parties' twenty-three-page agreement. Among other things, the agreement provided for joint legal custody, with Cisilie to have physical custody until each child is ten years old, after which each child would live for a year with Scotlund and then for a year with Cisilie until each child turned twelve, at which time the child would choose which parent would be the "residential parent." The agreement also obligated Cisilie to move after July 1, 1999, to the United States during the times when she was to be the "Residential Parent," and maintain a residence in proximity to Scotlund's residence.
In November 1999, Scotlund informed Cisilie that he intended to relocate from London, England, to Las Vegas. Scotlund demanded, pursuant to the agreement, that Cisilie relocate with the children to Las Vegas as well. Cisilie then commenced legal proceedings in Norway to allow her to remain with the children in Norway. Scotlund participated in the Norwegian proceedings.
In February 2000, Scotlund filed a motion in the district court in Clark County, seeking physical custody of the children, a finding that Cisilie was in contempt of the court and an order for the immediate production of the children.
Cisilie did not respond to Scotlund's Nevada motion. Instead she sought, from the Norwegian court, an order for the award of physical custody of the children to her. The Norwegian court appears to have been fully apprised of all the legal actions taken by each party up to that point. The Nevada district court does not appear to have been so informed.
The Norwegian court ordered Scotlund to respond to Cisilie's complaint. Scotlund instead requested an extension of time to respond. Scotlund meanwhile pursued his Nevada motion. On March 29, 2000, the district court in Nevada entered an order granting Scotlund's motion, no opposition having been filed. The order granted Scotlund custody of the children and held Cisilie in contempt.
In May 2000, Scotlund and his girlfriend met Cisilie and her fiancé and the children at a hotel in Oslo, Norway. After dining, the four adults and the children went to Scotlund's hotel suite because Scotlund said he wanted to give Kaia a birthday gift. Once inside the suite, Scotlund and his girlfriend took the children into an adjoining room to give them a "surprise." Cisilie and her fiancé waited out of view of the children. After a period of time, Cisilie entered the adjoining room and discovered that her children were gone. The room was empty. At the front desk, Cisilie was given an envelope left by Scotlund, which contained the Nevada court's order. Cisilie contacted the Norwegian police, who treated the incident as a kidnapping. She then filed a petition with the Norwegian court, seeking to enjoin Scotlund from leaving Norway with the children. Scotlund filed a response in opposition to her petition, and the Norwegian court swiftly issued an injunction forbidding Scotlund from taking the children out of Norway. Scotlund had already left Norway, however, and had earlier removed the children from Norway and sent them to his new residence in Texas.[2]
*511 On September 21, 2000, Cisilie filed in the Clark County district court a motion for the Immediate Return of Internationally Abducted Children and Motion to Set Aside Fraudulently Obtained Divorce. In the alternative, Cisilie moved to set aside the order granting Scotlund custody and holding her in contempt and also sought rehearing.
On October 10, 2000, and on October 17, 2000, the district court held an evidentiary hearing. On October 25, 2000, the court entered its order denying Cisilie's motions. Among other things, the district court found that Scotlund had satisfied Nevada's residency requirement, even though Scotlund had never lived in Nevada, and had not even been physically present in Nevada for the requisite six-week period. The district court therefore refused to set aside the divorce decree for lack of jurisdiction.

II.
The first question before us is whether the district court had jurisdiction to enter its decree of divorce in 1998. We conclude that the district court did not have personal jurisdiction over either party, nor did it have subject matter jurisdiction over the marital status of the parties when it entered the decree.
NRS 125.020(2) states, in pertinent part, "no court has jurisdiction to grant a divorce unless either the plaintiff or defendant has been resident of the state for a period of not less than 6 weeks preceding the commencement of the action." In addition, NRS 54.010 states that when the court's jurisdiction depends upon the residence of one of the parties to the action, the court shall require corroboration of the evidence. NRS 10.155 states that the legal residence of a person with reference to his right to maintain a lawsuit is that place where he has been physically present within the state during all of the period for which residence is claimed by him. The statute specifically states that "[s]hould any person absent himself from the jurisdiction of his residence with the intention in good faith to return without delay and continue his residence, the time of such absence is not considered in determining the fact of residence." The statute requires actual, physical presence in Nevada during "all of the period" for which residency is claimed. The only exception is for absence with a good faith intention of returning without delay. We note that one cannot return to a place of residence if one never lived there.
It is a well-settled principle of law in Nevada that residency under NRS 10.155 encompasses not simply an intent to reside in Nevada for an indefinite period of time, but actual, physical presence in this state for six weeks prior to the filing of the complaint for divorce. In Fleming v. Fleming,[3] this court had the opportunity to interpret a statute identical in all material aspects to NRS 10.155; we stated:
[I]t was the intention of the legislature to prescribe that actual, physical presence should be imminently essential to constitute a residence for the purpose of making that residence legal, where the party had any right dependent on residence ....
Giving to the word "resided," as used in the statute, its plain, ordinary significance, it must necessarily be construed to require an actual living in the county for six months preceding the filing of the suit. The word "resided" in its general acceptation carries with it the idea of permanency as well as continuity. It does not mean living in one place and claiming a home in another; it does not mean a constructive or imaginary residence in Washoe County, while actually living or abiding or being in some other county.[4]
In Aldabe v. Aldabe,[5] this court cited Fleming and a host of other Nevada cases for the proposition that "[r]esidence is synonymous with domicile and it is consonant with the many decisions of our court that the fact of presence together with intention comprise bona fide residence for divorce jurisdiction."
*512 Applying the principle of actual presence to Scotlund, it is clear that he had not established a residence in Nevada at the time the complaint was filed sufficient to confer upon the court jurisdiction to grant a divorce. Scotlund signed the verified complaint for divorce only five days after he had arrived in Nevada. Scotlund never resided in Nevada at any other, prior point in time. Scotlund's statement in his verified complaint that he was physically present in Nevada for more than six weeks prior to the commencement of the action is false.
Scotlund also filed the affidavit of a witness to corroborate his residency as required by NRS 54.010. The affiant swore as follows: "for more than six weeks I have known Plaintiff and have seen Plaintiff physically present in Clark County, Nevada on an average of 3-4 times weekly, unless stationed out of the state with his employer." (Emphasis added.) Essentially, the resident witness swore under penalty of perjury that she had known Scotlund for more than six weeks but not that she had seen him in Nevada for more than six weeks. This affidavit does not sufficiently corroborate Scotlund's claim of residency. Also, though not raised in this court by either party, we note that the district court's reliance upon the affidavit was improper for an additional reason.
Scotlund filed a complaint for divorce and secured and filed Cisilie's proper person answer. The district court may grant a divorce upon affidavit and without a hearing when the defendant has defaulted[6] or when the parties have filed a joint petition for divorce that complies with the summary proceedings for divorce set forth at NRS 125.181 to NRS 125.184. In no other circumstances do the domestic relations statutes permit the court to enter a decree of divorce without a hearing.[7] The district court was required to hear the live testimony of both Scotlund and his resident witness before entering its decree of divorce. We raise this point because it appears the district court was misled by the language of the complaint and the affidavit. A hearing might have uncovered the truth and the jurisdictional defect in this case.
Residency is a question of fact to be determined by the district court.[8] Courts in this state are obligated to determine that the residency requirement has actually been met and that residency is not being established by fraudulent means.[9]
In this case, the district court declined to set aside the decree of divorce based upon its determinations that Scotlund was in fact a resident, and that the court therefore had personal as well as subject matter jurisdiction. Since we conclude that the court did not have jurisdiction because Scotlund was not a resident, the question becomes whether the decree is void or merely voidable.
To answer this question, we turn to Moore v. Moore.[10] In that case, the appellant argued that the divorce decree was void because the plaintiff in the divorce proceeding had not satisfied Nevada's residency requirement.[11] The court determined, however, that because evidence was presented to the district court in the form of testimony from the plaintiff showing that he did, in fact, satisfy Nevada's residency requirement, the divorce decree in that case was not void, but merely voidable.[12] Quoting an 1875 United States Supreme Court decision, the court stated:
"[T]hat if there be a total defect of evidence to prove the essential fact, and the *513 court find it without proof, the action of the court is void; but when the proof exhibited has a legal tendency to show a case of jurisdiction, then, although the proof may be slight and inconclusive, the action of the court will be valid until it is set aside by a direct proceeding for that purpose. Nor is the distinction unsubstantial, as in the one case the court acts without authority, and the action of the court is void; but in the other the court only errs in judgment upon a question properly before the court for adjudication, and of course the order or decree of the court is only voidable."[13]
Accordingly, we concluded in Moore that although inconsistent evidence had been presented to the district court regarding the plaintiff's residency, the divorce decree was not void, but, instead, merely voidable.[14]
Likewise, we refer to our decision in Smith v. Smith.[15] In that case, although it initially appeared to the district court that all the requirements for service of process were met, it was later determined that the defendant had not been properly served due to a procedural irregularity.[16] We determined that this procedural irregularity did not render the judgment void, but that the decree was merely voidable.[17]
In the instant case, the evidence presented to the district court consisted of Scotlund's verified complaint and the affidavit of his resident witness. These documents provided the district court, at the time it entered the decree, with evidence legally tending to show a case of jurisdiction. On their face, these documents supported a finding that the district court had jurisdiction over the marital res. We so conclude, despite the inadequacy of the resident witness's affidavit. We note the affidavit was cleverly drafted but also legally tends to show a case of jurisdiction even though the proof is slight and not conclusive. Based upon the representations contained in the documents, a colorable case for jurisdiction was made; therefore, the decree is voidable rather than void. Finally, the district court's treatment of the case as a summary proceeding for divorce constituted a procedural irregularity that also renders the decree voidable rather than void.
We are compelled to observe that Nevada has a strong interest in protecting its valid divorce decrees. We recognize that Nevada's liberal six-week residency period makes this state an attractive forum in which to obtain a divorce. It is a sad reality of human nature as evidenced by Scotlund's conduct, that despite the liberality of the law, some will seek to speed their cause along in order to achieve a divorce in a time frame that suits their convenience rather than the requirements of the law. The district courts must be willing and prepared to diligently review each divorce action to remain assured that the integrity of any decrees entered is preserved, and should not hesitate to order the taking of testimony where necessary or desirable.[18] We are mindful that divorce decrees granted by our courts affect "collateral rights and interests of third persons."[19] As a matter of policy, district courts should be very interested in ascertaining whether jurisdiction actually exists before granting the decree so that decrees are valid and enforceable *514 and interested persons can rely on them. Other individual's rights and interests may be significantly affected when a divorce decree is granted but subsequently declared to be void.
Having concluded that the decree is voidable, we determine whether the decree ought to be set aside. The district court "found merit" in Scotlund's argument that Cisilie is judicially estopped from asserting that the court lacked jurisdiction to enter the decree of divorce. The district court was not required to reach the issue of judicial estoppel raised by Scotlund since the court had already determined that it had jurisdiction over both the parties and the subject matter. Nevertheless, the district court considered Cisilie's claim that she had been coerced or was under duress when she signed the answer to the complaint and the agreement. The district court determined as a matter of fact that Cisilie was not coerced or operating under duress. In fact, Cisilie had signed an answer to the complaint which admitted the fact of Scotlund's residence. Based upon these findings, which we will not disturb, the district court determined that Cisilie was estopped from attacking the decree's validity.
The rule of judicial estoppel is recognized in Nevada's case law. In Sterling Builders, Inc. v. Fuhrman,[20] we noted that according to the rule of judicial estoppel, a party who has stated an oath in a prior proceeding, "as in a pleading," that a given fact is true, may not be allowed to deny the same fact in a subsequent action. In that case, the court indicated that one of the rule's purposes is to prevent parties from deliberately shifting their position to suit the requirements of another case concerning the same subject matter.
As mentioned, Cisilie's answer to Scotlund's complaint admitted that Scotlund was a resident of Nevada. She now asserts a contrary fact in order to support her motion in the trial court to set aside the decree of divorce. We note that she relied upon the validity of the divorce decree when she decided to remarry. Because the district court determined that she was not operating under duress and was not coerced but did voluntarily sign the answer, her representations of fact contained within the answer are the proper subject for the application of the rule of judicial estoppel. Therefore, the voidable decree of divorce will not be set aside.
Two separate dissents have been written in this case. Both question our conclusion that Cisilie is judicially estopped from obtaining an order setting aside the decree of divorce based upon the district court's lack of jurisdiction. In brief response, we reiterate that the district court concluded as matters of fact that she was neither coerced nor under duress when she signed the answer and the agreement. The dissent points out that she did not prepare the answer she signed, and the record discloses no evidence that she was aware of Nevada's residency requirement. However, she knew that Scotlund had not resided in Nevada for six weeks when she signed the answer. She took advantage of those aspects of the agreement which allowed her to take custody of the children and she depended upon the decree's validity when she planned to marry again.
We realize that the posture of this case is unusual and unique since we are refusing to void a decree which was entered, as it turns out, by a court which had no jurisdiction over the parties. However, to reiterate, the decree was entered when the court believed it had jurisdiction. Any person who might review the district court filings would have no reason but to trust the validity of the court's decree. Under these circumstances, the law and the policies which support it permit no result other than that the decree is voidable, not void. As mentioned and for the reasons previously stated, we decline to declare the decree void.
Ironically, were we to adopt the reasoning of either dissent, then the fears of Justice Young that Scotlund might profit from a fraud upon the court would become a reality. As we will discuss next, we do declare void that portion of the decree which purports to determine the custody and visitation rights of the parties. However, because the decree is voidable and because we decline to declare it void, we are able to require the district court *515 to make a Hague Convention determination, as we will also discuss in this opinion. Scotlund, as noted, resides now in Texas and he has possession of the children. Were we to set aside the decree in its entirety, we would not be in a position to order the Hague determination. Cisilie would be put in the position of having to begin anew and commence, if she can, a proceeding against Scotlund in Texas.
The district court, in refusing to set aside the decree of divorce, also properly determined that it had no jurisdiction over the children. The court nevertheless determined that it had "jurisdiction over the parties' conduct toward each other with regard to the agreement under a contract theory." Based upon that analysis, the district court did not set aside the custody provisions of the divorce decree, and it erred in this regard. The children have never lived in Nevada. Neither party has ever lived in Nevada. The children have never had any contact with Nevada, much less substantial contact with the state. Neither do the parents have substantial contact with Nevada. The district court had no subject matter jurisdiction over the issue of child custody.[21]
Parties may not confer jurisdiction upon the court by their consent when jurisdiction does not otherwise exist.[22] The provision in the parties' agreement selecting Nevada as their forum for a divorce does not bind the court, nor does it confer jurisdiction upon the court. The court may not assume jurisdiction over matters of child custody and visitation based upon its perception of a "contract theory" or upon its view that because it has asserted personal jurisdiction over the parties, it can order them to do or not do certain things. Because the voidable decree has not been set aside, the court had colorable personal jurisdiction over the parties and the subject matter of their marital status. Simply because a court might order one party to pay child support to another in the exercise of its personal jurisdiction over the parties does not permit the court to extend its jurisdiction to the subject matters of child custody and visitation.
Unless the court can properly exercise subject matter jurisdiction according to the terms of the Uniform Child Custody Jurisdiction Act (UCCJA), which Nevada has adopted, it is without authority to enter any order adjudicating the rights of the parties with respect to custody and visitation. A provision in a divorce decree adjudicating custody and visitation in the absence of subject matter jurisdiction is void, as we held in Swan v. Swan.[23]
In Swan, the father moved to Nevada from Utah and, after several months, filed a complaint for divorce in Nevada. After filing his complaint, he returned to Utah, took the children and returned to Nevada with them. The mother filed an answer and contested the Nevada court's subject matter jurisdiction, but made no further filings or appearances in the action. The court granted the father a divorce and, based upon his testimony that the children resided with him, granted him custody. One and a half years later, the mother moved to vacate the custody provisions of the decree on the basis that the Nevada court had no jurisdiction over the subject matter under the UCCJA. Her motion was denied, but the district court's decision was reversed on appeal. We analyzed the facts under Nevada's version of the UCCJA and determined first, that Nevada was not the children's home state; second, that the children's residence in Nevada for forty days did not constitute a significant connection with this state; and third, even if dual jurisdiction existed, Utah was the more appropriate forum. Consequently, we concluded that the district court had incorrectly awarded custody as an incident of the default decree without having subject matter jurisdiction, and that the custody portion of the decree was void.[24] In our opinion, we noted that subject matter jurisdiction cannot be *516 waived and may be raised at any time, or sua sponte by a court of review.[25]
NRS 125A.050, which was adopted as a part of the UCCJA, sets out those circumstances under which a Nevada court has jurisdiction to make a child custody determination by initial or modifying decree. Under NRS 125A.050(1)(a), this state must be the home state of the children or have been the home state within six months before the action commenced. Neither is the case here. Under NRS 125A.050(1)(b), a Nevada court may exercise jurisdiction if it is in the children's best interest to do so because the children and at least one of their parents have a significant connection with Nevada and substantial evidence is available in Nevada concerning the children's present and future care, protection, training and personal relationships. As neither the children nor the parents have ever lived here or have a significant relationship with Nevada, virtually no information is available in this state to even arguably create jurisdiction under this provision. NRS 125A.050(1)(c) does not apply because it requires the presence of the children in Nevada. Finally, under NRS 125A.050(1)(d), Nevada may exercise jurisdiction if no other state would have jurisdiction or if another state has declined to exercise jurisdiction on the ground that Nevada is the appropriate forum and it is in the child's best interest that Nevada assume jurisdiction. This section of the statute also provides no basis for the Nevada court's exercise of jurisdiction. At the time the decree was entered, the children's last significant contacts with any state were with Ohio and Virginia. After living in Ohio and then Virginia, the children moved to the United Kingdom and Norway. Under NRS 125A.050, these countries are both considered states.[26] Neither Ohio nor Virginia has declined to exercise jurisdiction. Norway and the United Kingdom have both been involved in custody disputes between the parties.
The district court lacked subject matter jurisdiction over matters of custody and visitation when it entered the decree of divorce in 1998, and therefore the provisions of the decree which purport to fix the obligations of the parties with respect to custody and visitation are void.

III.
Next, we address petitioner's argument that the district court was required to make a determination, under the Hague Convention on the Civil Aspects of International Child Abduction, regarding the children's habitual residence, and whether the children were wrongfully removed from their habitual residence as those terms are construed under the Convention. The district court incorrectly concluded that it need not make such a determination. First, we note that Nevada has jurisdiction to make the determination. The United States Congress has implemented the Convention by enacting the International Child Abduction Remedies Act ("ICARA").[27] Under both the Convention and ICARA, an aggrieved party may institute judicial proceedings in the country to which the children have been removed.[28] State and federal courts have concurrent jurisdiction over such disputes.[29] Additionally, we conclude, as a matter of law, that the habitual residence of the children was Norway, and that the children were wrongfully removed from that country. Accordingly, the Hague Convention mandates that the children be promptly returned to Norway so that the courts there can determine the issue of custody.
*517 The Hague Convention on the Civil Aspects of International Child Abduction, to which the United States and Norway are signatories,[30] seeks to "secure the prompt return of children wrongfully removed to or retained in any Contracting State."[31] Furthermore, the primary purpose of the Hague Convention is "to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court."[32] The Hague Convention is meant to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of habitual residence."[33]
To achieve these goals, the Convention requires that, subject to certain exceptions, children who habitually reside in a signatory country and are removed to or retained in another signatory country in breach of the left-behind parent's custody rights shall be promptly returned to the country of their habitual residence.[34] The Convention provides that only after the children are returned to the country of their habitual residence will a custody determination be made.[35] Therefore, a court considering a petition under the Convention has jurisdiction to decide the merits of the wrongful removal claim, but not the underlying custody dispute.[36]
In this case, the district court determined that it was unnecessary to make a Hague Convention determination. The district court said that if it were to make a determination under the Convention, it would find that the children's habitual residence is Nevada, and that Cisilie had wrongfully retained the children in Norway. We disagree with these findings, based upon the uncontroverted fact that neither parent has ever lived in Nevada. We also conclude that the district court should have made a determination under the terms of the Convention.

Habitual residence
First, we examine the question of which country serves as the children's habitual residence. We begin by observing that although a court must identify which country is the children's "habitual residence," this term is nowhere defined in the Convention.[37] Instead, the term is intended by the Convention's drafters to be applied to the facts and circumstances of each case in a non-technical manner.[38]
We are not without guidance, however. Other courts that have addressed this issue have stated that when determining a child's state of habitual residence, courts must look back in time, not forward.[39] In other words, courts must look to the past experiences of the parties, and not to the parties' future intentions.[40] Furthermore, when conducting this inquiry, the focus is on the child, not the parents.[41] Therefore, any subjective intentions that the parents harbor regarding where the child is to live are irrelevant. *518 Additionally, any change in geography that would affect a child's habitual residence must occur before the removal at issue.[42] Although the child's physical whereabouts are central to an inquiry, one parent's "questionable removal" of the child is not determinative when ascertaining habitual residence. Courts also look to where children have a "degree of settled purpose."[43] Under this analysis, the child has a degree of settled purpose in "the place where he or she has been physically present for an amount of time sufficient for acclimatization."[44]
Ordinarily, a determination of habitual residence is a question of fact which we will not disturb. After reviewing the facts and circumstances of this case, however, we conclude, as a matter of law, that only one country could possibly be the habitual residence. The children's state of habitual residence prior to their removal was Norway. The record in this case reveals that in July 1998, when the children were three and seven years of age, they moved from London, England, where they were residing at the time, to Norway. They remained in Norway for twenty-two months until they were removed to the United States by Scotlund in May 2000. While in Norway, the children were registered under Norwegian law as residents of that country. And during their stay in Norway, the children attended school and otherwise conducted their lives as normal children. The children, while living in Norway, had a "degree of settled purpose" to remain there.
Although there is some evidence in the record that Cisilie and Scotlund may have intended that the children would move to the United States at some time in the future,[45] the courts are not bound, as we have previously stated, by the intentions of the parents regarding future events.[46] Furthermore, Scotlund's unilateral act of removing the children from Norway cannot change their state of habitual residence. Therefore, the children's state of habitual residence was Norway at the time Scotlund removed them from that country. Their habitual residence could be nowhere else. It could not be Nevada, as neither they nor their parents ever lived here. It could not be Great Britain, as no evidence exists in the record to support a finding that upon the family's departure from Great Britain, either parent ever expected to return.

Wrongful removal
Having concluded that the children's habitual residence was Norway, we must next determine whether Scotlund "wrongfully removed" the children from that country. Under the Hague Convention, removal or retention of a child is wrongful if it violates the custody rights of another person which were actually being exercised at the time of the removal or retention or would have been exercised but for the removal or retention.[47]
In the underlying case, the district court concluded that it need not make a Hague Convention determination because Scotlund had not wrongfully removed the children from Norway. Instead, the district court found that Cisilie had wrongfully retained the children in Norway contrary to their *519 agreement. The district court's determination that Scotlund had not wrongfully removed the children from Norway was improper.
Scotlund arrived in Norway with an order from the district court finding Cisilie in contempt for violating the terms of the Nevada divorce decree. Specifically, the district court had determined that Cisilie was violating the parties' agreement, which had been incorporated into the terms of the divorce decree and which required her to return the children to Scotlund. Accordingly, the district court granted Scotlund custody of the children.
The district court, however, relied upon Scotlund's untruthful representation when it issued its order granting him custody of the children. At the hearing held to decide whether Cisilie was in contempt of court for failing to bring the children to the United States as contemplated by the parties' agreement, the district court asked Scotlund how long he and the children had lived in Nevada. Scotlund responded that they had lived in Nevada "all their lives." The district court then issued its order holding Cisilie in contempt. This order further stated that Cisilie was to immediately return the children to Scotlund's custody.
Had the district court been apprised of the true facts, the order compelling Cisilie to return the children to Scotlund's custody might not have been granted. Moreover, the underlying basis for the order, the provision in the divorce decree incorporating the parties' agreement as to custody and visitation, is void and unenforceable.
Accordingly, when Scotlund traveled to Norway to take custody of the children, he did so under an invalid order. Further, Cisilie was properly exercising custody rights over the children when Scotlund arrived in Norway. Because Scotlund removed the children from their habitual residence while Cisilie was validly exercising custody rights over the children, and because he removed the children under the false pretense of a valid custody order, Scotlund wrongfully removed the children from Norway. Under the terms of the Hague Convention, the children must be returned to Norway so that any decision regarding custody can be made in the courts of that country.[48]

IV.
In this case, the district court lacked subject matter jurisdiction over custody and visitation. Furthermore, the district court manifestly abused its discretion by failing to make a determination under the Hague Convention on the Civil Aspects of International Child Abduction regarding the children's state of habitual residence. As the children's state of habitual residence was, as a matter of law, Norway, and as Scotlund wrongfully removed the children from that country, the district court was required to make these determinations. Accordingly, we grant the petition and direct the clerk of this court to issue a writ of mandamus compelling the district court to vacate those portions of its decree relating to custody and visitation and to order the children's return to Norway, where custody determinations can be made.
ROSE, LEAVITT and BECKER JJ., concur.
MAUPIN, C.J., dissenting.
I would grant the petition and declare the voidable divorce decree void in its entirety. In granting the petition, I would further conclude that the district court was not authorized to grant relief under NRS 125A.050, nor was it authorized to make findings under the Hague Convention on the Civil Aspects of International Child Abduction.
It is true that petitioner judicially admitted the facts alleged in the original divorce complaint in support of the real party in interest's residency, and thus the primary fact in support of subject matter jurisdiction over *520 the marriage and the issues related thereto. The majority now concludes that this admission constitutes a judicial estoppel, which relieves the district court, and therefore this court, from the obligation to declare as void, in its entirety, the admittedly voidable divorce decree. I disagree.
Once the facts of voidability became known, it was incumbent on the district court to void the decree for want of subject matter jurisdiction. As the majority points out, actions of the parties cannot confer subject matter jurisdiction on a court when none otherwise exists. Application of the doctrine of judicial estoppel to these facts would do just that. Since the district court determined that it did have jurisdiction, it is incumbent upon this court to now declare the underlying decree void in its entirety.[1]
The majority's reliance on our published opinion in Sterling Builders, Inc. v. Fuhrman[2] is misplaced. This is because our application of judicial estoppel in Sterling had nothing to do with subject matter jurisdiction. Sterling merely applied the rule of estoppel to prevent a party from denying that a partnership existed in the context of a factual dispute.[3] The Sterling decision did not apply the doctrine of judicial estoppel to confer jurisdiction where there was none, and we should not do so now.
The estoppel argument was not sufficient to give any continuing life to the decree. I realize that, under this view, there would be collateral effects on these parties with regard to their post-decree actions and their status as divorced persons. This is particularly unfortunate with regard to petitioner who, at the very least, was a victim of the post-divorce behavior of the real party in interest. This does not, however, alter the fact that the decree was actually voidable in all respects and should be so declared.
No other remedies are available to petitioner under Nevada law. NRS 125A.050, the Nevada version of the UCCJA, cannot provide relief since Nevada is neither the home state of the children of the parties, nor was it their home state at any time. In point of fact, these children have never had any significant connection with the state. It therefore appears that the district court was seriously misled in its deliberations below, given the real party in interest's statement that the children had lived in Nevada "all their lives."
The district court also does not have jurisdiction to make findings under the Hague Convention on the Civil Aspects of International Child Abduction. This is because actions under the Convention must be made in a "court which has jurisdiction of such action[s] and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed."[4]
YOUNG, J., with whom SHEARING, J., agrees, dissenting:
I disagree with the majority's conclusion that the decree of divorce is voidable, not void; and I also disagree with the majority that Cisilie is judicially estopped from questioning the decree obtained through Scotlund's fraud.

1. The decree of divorce is void, not voidable

In the majority opinion, my colleagues hold that the decree fraudulently obtained by Scotlund without establishing residency is voidable, not void. This holding is contrary to long-established law in this state and undermines Nevada's statutory scheme requiring a six-week residency.
For many years, it has been well settled that a divorce decree issued by a district *521 court without jurisdiction is void.[1] Here, the majority relies on Smith v. Smith[2] where the plaintiff's good faith failure to properly serve the defendant constituted a procedural irregularity rendering the judgment merely voidable, not void.
Smith is factually distinguishable from the instant case because in that case there was no fraud, merely a procedural irregularity. The plaintiff in Smith established residency for the requisite period in Nevada; the testimony of the resident witness was not flawed. A default had been taken after thirteen days from service of process instead of the requisite twenty days. In contrast, here, Scotlund did not attempt to comply with Nevada law requiring six-week residency. Scotlund had resided in Nevada only five days when he signed the complaint. Thus, this case does not involve a mere procedural irregularity as in Smith. The majority's reliance on Smith is misplaced because here the district court clearly lacked jurisdiction and the decree of divorce was void.[3]
Additionally, the majority relies on Moore v. Moore.[4] In Moore, the husband obtained a decree of divorce after he had physically resided in Nevada for more than six weeks.[5] Later, the husband and wife sought to void the decree saying that although the husband had been physically present in Nevada and contrary to his testimony in court, he really had not intended to make Nevada his residence.[6] To determine whether the decree of divorce was void or voidable, we reviewed the "manner in which the trial court had exercised its authority to resolve the factual problem confronting it [the issue of residency]."[7] Specifically, we noted that a decree is void when there is "`a total defect of evidence to prove the essential fact, and the court find[s] it without proof.'"[8] Under such circumstances, "`the court acts without authority, and the action of the court is void.'"[9] In Moore, the husband's testimony that he had been a bona fide resident in Nevada for more than six weeks was sufficient to make the decree of divorce merely voidable.[10]
In contrast, the facts before this court indicate that there was a total defect of evidence proving that Scotlund was a resident of Nevada. Three facts are significant. First, the majority admits that Scotlund's statement concerning residency in the verified complaint was false. In fact, when the complaint was signed, Scotlund had been in the state for a period of only five days. Second, the affidavit of the resident witness did not corroborate Scotlund's claim of residency by "clear and convincing evidence" as required by law.[11] The affidavit was cleverly worded to indicate that the affiant had known Scotlund for "six weeks"but not during the six weeks he was claiming residency in Nevada. The affiant further stated that she had seen Scotlund physically present in Nevada "on an average of 3-4 times weekly." It was signed when Scotlund had been in Nevada only six days, not for a period of six weeks. Third, the district court entered the decree in chambers without a hearing. At the time the decree was signed, Scotlund was thousands of miles away in England. It is abundantly clear that Scotlund had not established a residence in Nevada at the time the complaint was filed sufficient *522 to confer jurisdiction upon the district court to grant a divorce.
Unlike Moore, there was a total defect in the evidence presented to the district court. Hence, based on the lack of residency, the decree of divorce is void, not merely voidable.
Adopting the majority's view would undermine Nevada's statutory scheme requiring a six-week residency. A non-resident plaintiff seeking an expedient divorce could travel to Nevada, file a complaint the same day, and obtain a decree of divorce immediately. The problem with holding that such a decree is voidable, as we are urged to do in the majority opinion, is that individuals could commit fraud upon our courts and reap the dubious benefits of a voidable divorce decree, which is what Scotlund is doing here.

2. Judicial estoppel

Scotlund attempts to breathe life into a void decree by alleging that Cisilie is judicially estopped to question the validity of the void decree. If we hold the decree of divorce to be void, we need not reach the question of whether Cisilie is judicially estopped. However, since the majority reached this question, I feel obliged to convey my concerns about the application of judicial estoppel under the circumstances before this court.
The United States Supreme Court has stated that judicial estoppel is designed to "`protect the integrity of the judicial process'"[12] in order to "`prohibit[ ] parties from deliberately changing positions according to the exigencies of the moment.'"[13] It follows that the doctrine of judicial estoppel is an equitable doctrine applied by a court at its discretion.[14]
In this case, I submit the district court erred by finding that Cisilie was not coerced or operating under duress when she signed the answer (prepared by Scotlund's Nevada divorce attorney) admitting to Scotlund's claim of residency.[15] The record shows that Scotlund had threatened Cisilie that he would take the couple's children away from her if she did not cooperate with the divorce.[16] It was a threat that was later carried out when Scotlund kidnapped the children in Norway by trickery and deceit and flew to the United States. The district court abused its discretion by invoking the doctrine of judicial estoppel against Cisilie.
Moreover, a court has discretion not to apply judicial estoppel when "`a party's prior position was based on inadvertence or mistake."'[17] In this case, Cisilie is not judicially estopped because there is no evidence to suggest that she was aware of Nevada's residency requirement. In fact, she had never resided in Nevada. The answer that she signed was prepared by her husband's attorney in Nevada and sent by airmail to her in Norway for immediate signature. She had planned on remarriage; but when an attorney in Norway advised her that there might be some doubt as to the validity of the Nevada decree, Cisilie cancelled the marriage ceremony. She has spent thousands of dollars in fees and travel expenses in an effort to set aside the admittedly fraudulent decree and will presumably have to spend thousands of additional dollars to regain custody of her children illegally taken from her in Norway by Scotlund. Thus, the district court incorrectly applied the doctrine of judicial estoppel because Cisilie's admission to Scotlund's claim of residency was not knowingly made and certainly not a representation that Scotlund *523 could rely on to prove his residency under Nevada law or prevent her from questioning the residency requirement.
Finally, we have stated that the "`purpose of the doctrine of judicial estoppel is to suppress fraud ... and to eliminate the prejudice that would result to the administration of justice if a litigant were to swear one way one time and a different way another time.'"[18] In this case, invoking judicial estoppel against Cisilie protects Scotlund from the consequences of his fraud upon the district court and inhibits the administration of justice. Scotlund was the sole architect of the scheme to perpetrate fraud on the district court. He should not be allowed to harvest the benefits of such fraud. Our court should not close the doors of justice to the innocent and reward the wrongdoer in the name of judicial estoppel.

3. Digression (the state of our legal system)

I am disturbed about the conduct of Scotlund's divorce attorney in this case. The attorney prepared a complaint that falsely alleged Scotlund's residency in Nevada. The divorce attorney knew or should have known that Scotlund had not been a resident of Nevada for six weeks when he signed the complaint.[19] Further, the affidavit signed by the resident witness was cleverly drafted by the divorce attorney in a misleading manner in an effort to corroborate residency.

CONCLUSION
I strongly disagree with the conclusion of the majority that the decree of divorce was merely voidable, not void. The decree of divorce is void because the district court lacked jurisdiction to grant a divorce. To hold the decree voidable will lead to absurd results and undermines Nevada's statutory scheme requiring residency of at least six weeks. Moreover, in my opinion, the court need not reach the question of judicial estoppel because the decree is void. Nonetheless, I strongly disagree with the conclusion that Cisilie is somehow judicially estopped. She was the victim, not the wrongdoer. Finally, the district court lacked subject matter jurisdiction to make findings under the Hague Convention. Scotlund lied to the district court, during the custody hearing, when he testified that the children had lived in Nevada "all their lives." The fact is that the children had never resided in Nevada and apparently after being kidnapped in Norway were flown to Texas where presumably they now live.[20]
SHEARING J., concurs.
NOTES
[1] The Hague Convention on the Civil Aspects of International Child Abduction will be referred to throughout this opinion as "the Hague Convention" or simply as "the Convention."
[2] The Norwegian court did not decide the issue of custody in its order enjoining Scotlund from removing the children from Norway. Rather, the court acknowledged the Nevada court's order and determined that a full hearing was necessary to address the custody issue.
[3] 36 Nev. 135, 134 P. 445 (1913).
[4] Id. at 138-40, 134 P. at 447 (citation omitted).
[5] 84 Nev. 392, 396, 441 P.2d 691, 694 (1968).
[6] NRS 125.123.
[7] WDCR 41 permits the submission of an uncontested divorce without a hearing if the parties stipulate to waive the hearing and if the district court approves the waiver. We are unaware of a similar rule in the Eighth Judicial District Court.
[8] See Woodruff v. Woodruff, 94 Nev. 1, 3, 573 P.2d 206, 207 (1978).
[9] McKim v. District Court, 33 Nev. 44, 52, 110 P. 4, 5 (1910) ("It is the duty of courts in divorce proceedings to see that the proof of residence is clear and convincing, and that a fraud is not being perpetrated upon the court.").
[10] 75 Nev. 189, 336 P.2d 1073 (1959).
[11] See id. at 191-92, 336 P.2d at 1074.
[12] See id. at 193, 336 P.2d at 1075.
[13] Id. (emphases added) (quoting Lamp Chimney Co. v. Brass & Copper Co., 91 U.S. 656, 659-60, 23 L.Ed. 336 (1875)).
[14] Id. at 193, 336 P.2d at 1075.
[15] 82 Nev. 384, 419 P.2d 295 (1966).
[16] See id. at 385, 419 P.2d at 296.
[17] See id. at 386, 419 P.2d at 296.
[18] See NRS 125.123 (providing that the district court is not required to accept a case for default divorce upon submission; court has the discretion to order a hearing and require the presence of the plaintiff and the resident witness).
[19] Self v. Self, 319 Ark. 632, 893 S.W.2d 775, 778 (1995). In Self, the Supreme Court of Arkansas stated:

We have stated that judgments in matrimonial cases should be more stable than in others, because matrimonial status draws with it so many collateral rights and interests of third persons. However, we have also held that when divorces have a "mail-order" appearance, we shall not hesitate to set them aside, even though the divorced party remarries in the meantime, as we cannot permit such frauds to be practiced upon the courts of this state.
Id. (citations omitted).
[20] 80 Nev. 543, 549-50, 396 P.2d 850, 854 (1964).
[21] NRS 125A.050 (setting forth the factors for determining whether a court has jurisdiction to determine child custody).
[22] Finley v. Finley, 65 Nev. 113, 120, 189 P.2d 334, 337 (1948).
[23] 106 Nev. 464, 796 P.2d 221 (1990).
[24] Id. at 469, 796 P.2d at 224.
[25] Id.
[26] NRS 125A.030 is captioned "Application of chapter to decrees of other nations." The statute states:

The general policies of this chapter extend to other nations. The provisions of this chapter relating to the recognition and enforcement of custody decrees of other states apply to custody decrees and decrees involving legal institutions similar in nature to custody institutions rendered by appropriate authorities of other nations if reasonable notice and opportunity to be heard were given to all affected persons.
[27] 42 U.S.C. §§ 11601-11610 (1988).
[28] Hague Convention, arts. 8, 11, 29; 42 U.S.C. § 11601 (1988).
[29] 42 U.S.C. § 11603 (1988).
[30] The United States ratified the Convention in 1988, while Norway ratified the Convention in 1989.
[31] Hague Convention, art. 1.
[32] Friedrich v. Friedrich, 983 F.2d 1396, 1400 (6th Cir.1993) ("Friedrich I").
[33] Hague Convention, preamble.
[34] Hague Convention, arts. 12, 13.
[35] Id. art. 19.
[36] Friedrich v. Friedrich, 78 F.3d 1060, 1063 (6th Cir.1996) ("Friedrich II").
[37] See Miller v. Miller, 240 F.3d 392, 400 (4th Cir.2001); Friedrich I, 983 F.2d at 1400.
[38] See Friedrich I, 983 F.2d at 1401 (quoting In Re Bates, No. CA 122.89, High Court of Justice, Family Div'n Ct. Royal Court of Justice, United Kingdom (1989) (quoting Dicey & Morris, The Conflicts of Laws 166 (11th ed.))), which explained:

"It is greatly to be hoped that the courts will resist the temptation to develop detailed and restrictive rules as to habitual residence, which might make it as technical a term of art as common law domicile. The facts and circumstances of each case should continue to be assessed without resort to presumptions or pre-suppositions."
[39] Friedrich I, 983 F.2d at 1401.
[40] Id.
[41] Id.
[42] Id.
[43] Feder v. Evans-Feder, 63 F.3d 217, 224 (3d Cir.1995).
[44] Id.
[45] The children have dual American and Norwegian citizenship.
[46] Based upon our thorough review of the record, we harbor grave concerns regarding the validity of Scotlund and Cisilie's "agreement." In any event, because we have determined that the portion of the divorce decree that incorporated the custody and visitation provisions of the agreement is void, we are not bound by those terms.
[47] Hague Convention, art. 3. This article reads:

The removal or retention of a child is to be considered wrongful where
a it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
b at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
[48] Hague Convention, art. 12. We also note in passing that after Cisilie filed her petition in this court, Scotlund informed us that the Norwegian court determined that it does not have jurisdiction to determine custody. The Norwegian court's decision placed "decisive emphasis" upon the parties' twenty-three-page agreement and the district court's decree of divorce. The Norwegian court obviously presumed that the decree was valid in all respects. The crucial provisions of the decree upon which the Norwegian court relied are void.
[1] See NRCP 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").
[2] 80 Nev. 543, 396 P.2d 850 (1964).
[3] Id. at 549-50, 396 P.2d at 854.
[4] 42 U.S.C. § 11603(b) (1995) (emphasis added).

It does appear from the record of this case that these children were wrongfully removed from Norway, that Norway was their habitual residence at the time of their abduction and that, under the Convention, they should be returned to the Norwegian tribunal for the appropriate custody determination. It also appears that the Norwegian court was misled into deferring to the voidable Nevada decree.
[1] Milton v. Gesler, 107 Nev. 767, 771, 819 P.2d 245, 248 (1991) (holding that because the district court acted without jurisdiction, the decree of divorce is void); La Potin v. La Potin, 75 Nev. 264, 266, 339 P.2d 123, 123-24 (1959) (same); Perry v. District Court, 42 Nev. 284, 288, 174 P. 1058, 1059 (1918) (same).
[2] 82 Nev. 384, 419 P.2d 295 (1966).
[3] See Milton, 107 Nev. at 771, 819 P.2d at 248; La Potin, 75 Nev. at 266, 339 P.2d at 123-24; Perry, 42 Nev. at 288, 174 P. at 1059.
[4] 75 Nev. 189, 336 P.2d 1073 (1959).
[5] Id. at 192, 336 P.2d at 1074.
[6] Id. at 190-92, 336 P.2d at 1073-74.
[7] Id. at 193, 336 P.2d at 1075.
[8] Id. (quoting Lamp Chimney Co. v. Brass & Copper Co., 91 U.S. 656, 659-60, 23 L.Ed. 336 (1875)).
[9] Id. (quoting Lamp Chimney, 91 U.S. at 660).
[10] Id. at 192-93, 336 P.2d at 1074-75.
[11] McKim v. District Court, 33 Nev. 44, 52, 110 P. 4, 5 (1910).
[12] New Hampshire v. Maine, 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (quoting Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 598 (6th Cir.1982)).
[13] Id. at 750, 121 S.Ct. 1808 (quoting U.S. v. McCaskey, 9 F.3d 368, 378 (5th Cir.1993)).
[14] Id.
[15] When Cisilie received the answer, she was unknowingly recruited by Scotlund to participate in the perpetration of fraud upon the district court. I see no evidence to the contrary.
[16] Cisilie could reasonably believe that Scotlund would carry out his threats and that she would never see her children again based on Scotlund's family history. Cisilie was aware that Scotlund's mother had kidnapped him and his siblings to another state, changed their last name, and the father kidnapped them back.
[17] New Hampshire, 532 U.S. at 753, 121 S.Ct. 1808 (quoting John S. Clark Co. v. Faggert & Frieden, P.C., 65 F.3d 26, 29 (4th Cir.1995)).
[18] Sterling Builders, Inc. v. Fuhrman, 80 Nev. 543, 550, 396 P.2d 850, 854 (1964) (quoting 31 C.J.S. Estoppel § 121, at 649, 650).
[19] The record indicates that the divorce attorney and Scotlund were communicating about the divorce case when Scotlund was living in England, just days before he flew to Las Vegas.
[20] I would refer this matter to the State Bar of Nevada for investigation of the conduct of Scotlund's divorce lawyer. See NCJC Canon 3D(2) (imposing upon a judge an affirmative obligation to take appropriate action upon receiving information indicating substantial likelihood that a lawyer has committed a violation of the Nevada Rules of Professional Conduct). Furthermore, I am disturbed with Scotlund's behavior. Accordingly, I would refer this matter to the Clark County District Attorney's Office for investigation. The clerk of this court shall provide a copy of this opinion and dissent to the State Bar of Nevada and to the Clark County District Attorney's Office.